UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

LUBBOCK DIVISION

| ROBERT TRENT, | § | |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | Case No. : 5:25-cv-00176-H-BV |
| | § | |
| CAPELLA UNIVERSITY, LLC, | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

INTRODUCTION

Defendant's Motion to Dismiss should be denied. The motion rests on a flawed premise: asking the Court to accept Defendant's self-serving factual narrative while ignoring the most damning allegations in the Complaint. This is not merely a wrongful termination case—it is a case about discrimination, retaliation, and cover-up that has already attracted federal attention from multiple agencies. The U.S. Department of Justice has already referred Plaintiff's civil rights complaint to its Disability Rights Section, and Congressman Jodey Arrington's office initiated multiple congressional inquiries into Plaintiff's whistleblower activities. (Compl., Intro. ¶ 3).

Tellingly, when Defendant had to explain this termination to the Texas Workforce Commission under penalty of perjury, it could only state "Details not available" for the final incident and declined to contest unemployment benefits—essentially admitting it lacked legitimate cause. (Compl. ¶ D.5).

1

Defendant's motion is built on factual distortions and asks this Court to ignore key sentences in its own exhibits. Defendant asks the Court to believe that a manager pre-emptively denying an accommodation is "good faith," that altering legal documents is acceptable conduct, and that an employee hired as a coach, practicing "transformational advising" should be judged against unstated "customer service" standards, and that explicit notice of protected whistleblower activity is not sufficient to invoke whistleblower protections. When Plaintiff's Complaint is read as a whole and its well-pleaded facts are accepted as true, it states clear and plausible claims for relief.

**LEGAL STANDARD**

Defendant correctly notes that a complaint must state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, that standard must be applied alongside the Court's corresponding duty to "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

The plausibility requirement is not a "probability" test, and it does not authorize the Court to weigh evidence or resolve factual disputes at the pleading stage. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Plaintiff's Complaint, which sets forth a detailed factual narrative with specific dates, names, and events, far exceeds this threshold. Furthermore, it is well-established that pleadings filed by *pro se* litigants are to be liberally construed and held to less stringent standards than formal pleadings drafted by lawyers. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972).

**ARGUMENT**

**I. THE COMPLAINT PLAUSIBLY ALLEGES DISABILITY DISCRIMINATION, RETALIATION, AND FAILURE TO ACCOMMODATE (COUNTS I & III).**

**A. Defendant's Motion is Based on a Deceptive Mischaracterization of Plaintiff's Role.**

The core of Defendant's argument is that Plaintiff failed to meet "customer service" standards. This fundamentally mischaracterizes his role. Plaintiff was hired as an "Academic *Coach*," a position explicitly requiring "transformational coaching methods" designed to challenge learners and "get to the root of the issue." This coaching role—which requires serving as a "trusted partner" who challenges students—is antithetical to the deferential, customer-is-always-right service model Defendant now retroactively imposes.

The Complaint alleges that this "customer service" standard was a pretext, a new and subjective metric imposed on Plaintiff only after he disclosed his disability. For eight months, Plaintiff's performance as a coach was successful. (Compl. ¶ A.1). After he disclosed his disability on April 12, 2024, Defendant began scrutinizing his disability-related communication style under a newly-invented "customer service" standard. (Compl. ¶ A.3) At this stage, the Court must accept

as true that Plaintiff was a Coach, and that the sudden imposition of different job standards was discriminatory.

**The statistical reality exposes the pretextual nature of Defendant's claims.** Defendant bases its entire case on approximately 2 calls and 1 email from 2024, plus a single call in 2025. Yet Plaintiff handled 4,606 calls (not including other tasks) in 2024 alone while maintaining above-average performance metrics. (Compl. ¶ A.1). This means Defendant terminated an employee—just 14 days after his whistleblower notice, among other things—allegedly based on less than 0.05% of his work performance. No reasonable employer fires a high-performing employee over such a statistically insignificant sample (while skipping progressive discipline) unless the true motive is discriminatory or retaliatory. This glaring disproportion between Plaintiff's overall exemplary performance and the cherry-picked incidents further demonstrates that Defendant's proffered reasons are pretext for unlawful discrimination.

### B. Defendant's Refusal to Provide Actual Communications Reveals Its Bad Faith.

In 23 pages of briefing, Defendant conspicuously fails to provide a single actual quote from any allegedly "unprofessional" communication. This omission is not accidental—it is strategic. Defendant knows that context matters. Were the actual communications revealed, the Court would see that Plaintiff was either: (1) protecting himself from abusive learners who had or were yelling at him i.e. hanging up on calls (Def.'s Ex. D, APP 9); (2) setting appropriate boundaries with learners who refused to engage constructively; or (3) using coaching techniques to challenge entitled attitudes that were hindering academic progress.

Defendant's characterization of these interactions as so "rude" and "unprofessional" that (despite being only 0.05% of his entire work performance) it warranted termination, without providing the actual words or context is a tacit admission that the communications, when viewed in full context, would not support their narrative. An employer confident in its position would quote the offensive language directly both here and in fillings with the TWC. Defendant's refusal to do so, while asking this Court to accept its conclusory labels, should not be rewarded at the motion to dismiss stage.

### C. Plaintiff Has Plausibly Alleged He is a "Qualified Individual."

Defendant's argument that Plaintiff is not a "qualified individual" rests on the demonstrably false premise that he sought to be "excused" from an essential function. This assertion is directly contradicted by Defendant's own Exhibit A. In his contemporaneous written note on the Corrective Action Form, Plaintiff stated unequivocally:

**"This is not an indication or admission of inability to perform job related duties but rather to convey my needs for accommodation."** (Def.'s Ex. A, APP 2).

Plaintiff never requested an exemption from professionalism. He affirmed his ability to perform the job and requested accommodation for his "disability-related communication style"—such as

clearer, more literal instructions—that would enable him to meet the newly implemented and pretextual "customer service" standard by which he was being disciplined for after 8 months without incident and 32 days after disclosing his disability. By deliberately omitting Plaintiff's own words and twisting his request for help into a demand for exemption, defendant attempts to use the incorporation-by-reference doctrine to defeat the Complaint, but its own exhibit accomplishes the opposite. The doctrine does not permit the court to resolve factual disputes, and here, Defendant's Exhibit A directly supports the Complaint's allegation that Plaintiff affirmed his ability to perform the job and was requesting an accommodation, not an exemption.

**D. Defendant, Not Plaintiff, Caused the Breakdown of the Interactive Process Through Deliberate Obstruction and Impossible Deadlines**

Defendant's argument that Plaintiff is responsible for the breakdown of the interactive process is contradicted by its own exhibits and recent Fifth Circuit precedent. In *Strife v. Aldine Independent School District*, No. 24-20269 (5th Cir. May 16, 2025), the Fifth Circuit held that a six-month delay in providing accommodation showed lack of good faith, even when accommodation was eventually granted. The court warned that employers cannot 'force an aggrieved employee to endure an endless interactive process.'

Defendant's conduct here was far worse than in *Strife*:

**First, Defendant completely failed to act upon notice.** Plaintiff disclosed his disabilities to McHugh on April 12, 2024. McHugh took NO action to initiate any interactive process. This 52-day silence before the first disciplinary action violates *Strife*'s holding that the employer's obligation triggers immediately upon knowledge.

**Second, Defendant prejudged the outcome.** Within 24 hours of Plaintiff's June 4 accommodation request, McHugh declared that 'the role expectation of professional communication at all times with learners would not change, even with a potential accommodation.' (Def.'s Ex. B, APP 3). This prejudgment before any interactive process is more egregious than the unnecessary medical exam in *Strife*.

**Third, Defendant erected impossible barriers.** When Plaintiff persisted, HR's June 21 response (17 days later) imposed a 15-day deadline to obtain comprehensive medical documentation, threatening to 'consider the request closed' if not met. (Def.'s Ex. C, APP 5-6). This deadline was particularly unconscionable given that Lubbock County is a federally-designated Health Professional Shortage Area for mental health, where psychiatric appointments typically require 2-6 month waits. Defendant knew or should have known that meeting this deadline was impossible, yet threatened case closure anyway.

**Fourth, Defendant reserved unlimited discretion to deny.** Even if Plaintiff achieved the impossible, HR's email ominously noted that departmental leadership approval would be needed 'if any'—suggesting that even after jumping through impossible hoops, denial was predetermined.

4

As the Fifth Circuit recognized in recent cases like *Thompson v. Microsoft Corp.*, a genuinely interactive process is the best defense against ADA claims. Here, Defendant did the opposite: silence, prejudgment, impossible deadlines in a medically underserved area, and reserved discretion to deny. This is precisely the 'endless interactive process' that *Strife* prohibits.

**E. The Complaint Alleges a Clear Pattern of Retaliation.**

The Complaint documents a pattern of retaliation that intensified with each protected act. The timeline is damning:

- August 28, 2023: Plaintiff begins job as academic coach
- April 12, 2024: Plaintiff discloses disability
- May 14-20, 2024: Cited for "speaking rudely" (32 days after disclosure)
- June 4, 2024: CAF with "final written warning" (bypassing progressive discipline)
- June 5, 2024: Manager's pre-determined refusal to accommodate
- October 2024: Plaintiff begins investigation and reporting of suspected title iv fraud to various agencies
- February 24, 2025: Accelerated negative performance review hours after Plaintiff challenged improper PTO denial and days after he filed additional reports with federal and state authorities of what he reasonably believed was fraud
- February 26, 2025: Plaintiff provides employer with formal whistleblower notice of state and federal regulatory fillings
- March 12, 2025: Termination (14 days after whistleblower notice)

This timeline, with its extremely close temporal proximity between protected acts and adverse actions, establishes a clear and plausible causal link for retaliation.

**II. THE COMPLAINT PLAUSIBLY ALLEGES ADA INTERFERENCE (COUNT IV).**

Defendant's attempt to dismiss the interference claim on exhaustion grounds fails. As the Fifth Circuit has long recognized, claims are exhausted if they are 'like or related to' the charge's allegations. *McClain v. Lufkin Industries, Inc.*, 519 F.3d 264, 273 (5th Cir. 2008).

Plaintiff's EEOC charge specifically alleges that the 'CAF version on his official employee file was backdated... and did not include Robert's disability-related comments or his signature.' (Def.'s Ex. H, APP 21). Document alteration to conceal accommodation requests is quintessential interference with ADA rights—obstructing both the exercise of rights and the ability to prove their violation.

Under *Strife*'s emphasis on good faith obligations, evidence tampering to conceal accommodation requests represents the ultimate bad faith. An EEOC investigation into retaliatory document alteration would necessarily encompass interference claims

Substantively, Defendant's alteration of documents and its obstruction of email access for 33 hours after Plaintiff engaged in protected activity (Compl. ¶ D.1) are quintessential acts of interference designed to prevent Plaintiff from preserving evidence of discrimination.

### III. THE COMPLAINT PLAUSIBLY ALLEGES FCA RETALIATION (COUNT II).

**Defendant Deliberately Misapplies the Legal Standard by Conflating Qui Tam and Retaliation Claims.**

At the outset, Defendant's opposition misleadingly applies the wrong legal standard. Plaintiff brings an FCA retaliation claim under 31 U.S.C. § 3730(h), not a qui tam action under § 3730(b). These are fundamentally different claims with different requirements. Defendant's extensive discussion of Rule 9(b) particularity requirements for proving actual fraud is irrelevant. Plaintiff brings an FCA retaliation claim under 31 U.S.C. § 3730(h), not a qui tam action under § 3730(b). For retaliation claims, Plaintiff need not prove actual fraud occurred—only that "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *U.S. ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 605 (S.D. Tex. 2012); see also *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010). Plaintiff has clearly met this standard.

Notably, **Defendant cites exclusively to qui tam cases in its Rule 9(b) discussion, apparently hoping this Court will not notice that those heightened pleading requirements for proving actual fraud do not apply to retaliation claims.** This misleading conflation of distinct legal standards undermines Defendant's entire FCA argument.

Defendant's claim that it lacked notice of Plaintiff's protected activity is contradicted by both the Complaint and Defendant's own exhibits. The Complaint alleges specific instances of Plaintiff reporting fraud, including a written report to supervisor Dee Olsen that she was processing a "likely fraudulent" student refund claim involving Title IV funds. (Compl. ¶ C.4.b). This was not "mere criticism" but a protected act aimed at stopping fraud against the government.

Additionally, **Plaintiff engaged in protected activity by investigating and reporting to state and federal regulators regarding fraud on the United States—specifically, schemes to avoid required R2T4 refunds and false certifications material to Title IV disbursements.** (Compl. ¶ C.1). **Whether these acts constituted actionable False Claims Act violations is a factual question that can only be resolved through discovery, not on a motion to dismiss.**

Defendant's own Exhibit F definitively refutes its claimed ignorance. On February 26, 2025, Plaintiff sent a formal email with the unambiguous subject line: **"Formal Notice of Legal**

**Violations and Protected Whistleblower Disclosure."** (Def.'s Ex. F APP 16). This email explicitly put Defendant on notice of his "protected whistleblower activity" as well as informing them that **"These matters have been reported, and I strongly advise immediate compliance with all applicable laws and regulations."** For Defendant to now claim it lacked notice after receiving an email using such explicit terms strains credulity.

No "magic words" are required: Section 3730(h) protects lawful acts to stop FCA violations, including external reports to regulators. The only question is whether the employer knew—which Capella clearly did by February 26, 2025.

Plaintiff was terminated just 14 days after this formal notice. This close temporal proximity establishes the causal link required for an FCA retaliation claim.

Even assuming, arguendo, that the heightened *qui tam* pleading standards under Fed. R. Civ. P. 9(b) were to apply—which they should not in a retaliation-only action—Plaintiff's Complaint independently satisfies those requirements. Plaintiff specifically identified:
(1) the nature of the fraud (Title IV violations and refund manipulation),
(2) the actors involved (Capella University personnel within Financial Aid and Compliance functions),
(3) the time period of the conduct (October 2024–March 2025), and
(4) the resulting government injury (misuse of federal student aid funds, chapter 33 benefits, Pell grants and etc.).
These factual allegations provide the "who, what, when, where, and how" required under *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009), even though Rule 9(b) should not govern FCA retaliation claims.


### IV. DEFENDANT'S SILENCE ON EVIDENCE TAMPERING UNDERSCORES ITS BAD FAITH.

Perhaps the most telling aspect of Defendant's 23-page motion is what it does not address. Plaintiff's Complaint alleges that Defendant, in response to a lawful request for his personnel file pursuant to Minnesota Statute § 181.961, produced a materially altered and backdated document. Specifically, the document:

- Had Plaintiff's disability disclosure and accommodation request removed
- Had Plaintiff's signature removed
- Was backdated from June 4, 2024 to May 28, 2024—before the disciplinary meeting even occurred

(Compl. ¶ D.2).

Defendant's complete silence on this damning allegation of evidence tampering is deafening. This is not a minor procedural issue—it is potential criminal conduct that goes to the heart of Defendant's credibility and bad faith. **This act of post-hoc document alteration is part of a broader pattern of spoliation that discovery will fully expose.** For instance, discovery will produce an audio recording of Plaintiff's termination meeting wherein Director RT Taylor, when confronted with a specific Microsoft Teams message showing he was coordinating the termination of multiple protected-class employees, admits to "deleting [his] overall teams chat... period." This confession to the deliberate, wholesale destruction of communications by a senior manager in direct response to being presented with evidence is a quintessential act of spoliation. It makes the allegations of retaliation not merely plausible, but virtually undeniable. **At minimum, the pleaded allegation of evidence tampering presents a factual dispute that cannot be resolved on a motion to dismiss.** The Court must accept as true that Defendant engaged in evidence tampering, a fact that makes all of Plaintiff's claims not just plausible, but compelling. Moreover, the timing of this evidence destruction is telling. Under Fifth Circuit precedent, temporal proximity between protected activity and adverse action establishes causation. Here, the destruction of evidence occurred immediately after confrontation about discriminatory conduct—consciousness of guilt that would concern any court, particularly given the *Strife* court's emphasis on good faith obligations.

## V. DEFENDANT'S IMPOSSIBLE DEADLINES IN A MEDICALLY UNDERSERVED AREA DEMONSTRATE BAD FAITH.

Defendant's June 21 demand for comprehensive medical documentation within 15 days, was not merely unreasonable—it was deliberately impossible. Lubbock County is designated as a Health Professional Shortage Area (HPSA) by the federal government. Texas ranks 50th nationally in psychiatrists per capita. In Lubbock, new psychiatric appointments typically require 2-6 month waits.

Defendant knew or should have known these facts when it imposed a 15-day deadline with threats of case closure. Setting impossible deadlines in a medically underserved area while threatening to terminate the accommodation process shows the bad faith condemned in *Strife*. This Court, sitting in Lubbock, understands the practical impossibility of Defendant's demands.

Combined with McHugh's prejudgment and HR's hedge about director approval 'if any,' this impossible deadline reveals the process was designed to fail—precisely the type of 'endless interactive process' used to defeat disability rights that *Strife* prohibits.

## VI. DEFENDANT'S SHIFTING EXPLANATIONS AND INTERNAL INVESTIGATION DEMONSTRATE PRETEXT.

The pretextual nature of Defendant's conduct is further evidenced by its own contradictory statements and investigation. Despite being on notice of "serious legal violations," Defendant's HR failed to investigate or ask a single question about the reported illegalities, demonstrating consciousness of guilt.

Defendant's HR department concluded its investigation on March 11, 2025, and terminated Plaintiff's employment **less than 24 hours later**. This timing indicates the investigation was a pretextual exercise designed to justify a predetermined outcome (Compl. ¶ D.4).

This is further confirmed by Defendant's inability to articulate any legitimate reason for termination. When required to provide a reason to the Texas Workforce Commission—under penalty of perjury—Defendant stated "Details not available" for the final incident leading to discharge and explicitly chose "not contesting" Plaintiff's unemployment claim. (Compl. ¶ D.5). An employer with legitimate cause does not tell a state agency "we have no details" and then decline to contest benefits. This admission to a government agency that Defendant lacked any documentable reason for termination fatally undermines its current claim of legitimate business reasons.

## VII. The Fabricated "Performance Review" in Defendant's Appendix Further Proves Pretext.

Defendant's own exhibit—the 2024 *Know Where You Stand* (KWYS) performance review—undermines, not supports, its Motion to Dismiss. The document shows Plaintiff provided a detailed, reflective, and professional self-evaluation, citing measurable improvements in performance (e.g., increased task completion rate from 4.8 to 5.5 per hour, improved call quality, adherence to FERPA, and growth in handling escalated learners) (App. Ex. E, APP 11–15). In stark contrast, the "Manager Evaluation" column—reserved for the supervisor's written assessment—contains **no comments whatsoever** (App. Ex. E, APP 11–15).

This silence speaks volumes. A genuine performance review process includes written feedback, examples, and constructive guidance. The complete absence of manager commentary confirms that this review was never conducted in earnest, but rather completed post hoc to justify an already predetermined termination (App. Ex. E, APP 11–15). The pattern matches the retaliatory acceleration described throughout the Complaint: (1) no progressive discipline, (2) fabricated or backdated documentation, and (3) perfunctory or blank supervisory input to create a paper trail.

Courts routinely view such discrepancies—where the employee provides substantive evaluation but management leaves required sections blank—as indicia of pretext and bad faith. The omission is not a clerical oversight; it is evidence of **a rushed, retaliatory process designed to appear compliant while avoiding accountability.**

Moreover, the ratings themselves are internally inconsistent: the manager rated Plaintiff "Successfully Achieves Expectations" in key performance behaviors such as Change Management, Resilience & Grit, Mindset, and Time Management—yet assigned an overall "Development Needed" rating with no explanation (App. Ex. E, APP 11–15). A factfinder could reasonably infer that the absence of justification was intentional, further supporting the inference of retaliatory motive.

In short, Capella's own exhibit exposes its pretext. A manager who truly believed Plaintiff's performance was deficient would have provided examples. A manager who feared Plaintiff's protected disclosures, by contrast, would leave the review blank and let HR fill in the narrative later. The latter is exactly what happened here. (App. Ex. E, APP 11–15)

### VIII. IN THE ALTERNATIVE, PLAINTIFF REQUESTS LEAVE TO AMEND.

Should the Court find any technical deficiency in Plaintiff's pleadings, Plaintiff respectfully requests leave to amend. As a pro se litigant facing sophisticated counsel, any technical deficiencies should not bar Plaintiff from pursuing meritorious claims, particularly given the external validation of these claims by federal authorities. The liberal amendment standard of Rule 15(a) strongly favors granting leave, especially where, as here, there has been no prior amendment and discovery has not commenced.

### CONCLUSION

Defendant's motion asks the Court to adopt a fiction. The truth, as pleaded in the Complaint, is that Defendant targeted a disabled employee, invented pretextual reasons to discipline him, refused to engage in any good-faith accommodation process, altered documents to cover its tracks, and fired him 14 days after he formally declared himself a whistleblower. These well-pleaded facts state plausible claims for relief. The Fifth Circuit's recent precedents, particularly *Strife*, make clear that delays, bureaucratic obstacles, and bad faith in the interactive process violate the ADA. Defendant's own exhibits prove conduct worse than what the Fifth Circuit has already condemned: complete inaction after disclosure, prejudgment of futility, impossible deadlines in a medically underserved area, and evidence tampering to conceal these violations. Defendant's Motion to Dismiss should be DENIED in its entirety.

Dated: November 3, 2025

Respectfully submitted,



Robert Trent (Pro Se)
7510 88th St.
Lubbock, TX 79424
(806) 507-1592
Robert.trent0139@gmail.com

Use of Generative Artificial Intelligence: Pursuant to Local Civil Rule 7.2(f), the filer discloses that generative artificial intelligence was used in the preparation of this brief.

CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2025, a true and correct copy of the foregoing **Plaintiff's Opposition to Defendant's Motion to Dismiss** was served via electronic mail on all counsel of record at the email addresses listed below:

Terran C. Chambers - terran.chambers@faegredrinker.com

Daniel G. Prokott - daniel.prokott@faegredrinker.com

Susan A. Yelk - susan.yelk@faegredrinker.com

Susan E. Egeland - susan.egeland@faegredrinker.com

Robert Trent

7510 88th Street

Lubbock, TX 79424

(806) 507-1592

robert.trent0139@gmail.com



November 3, 2025

Clerk of Court

United States District Court

Northern District of Texas, Lubbock Division

1205 Texas Avenue, Room 209

Lubbock, Texas 79401-4091

Re: Trent v. Capella University, LLC, Civil Action No. 5:25-CV-176-H

Dear Clerk:

Enclosed for filing in the above-referenced case, please find the original and one judge's copy of the following two documents:

1. PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff apologizes for any inconvenience caused by paper filing and the absence of hole-punching due to equipment unavailability. Plaintiff will comply with all formatting requirements once PACER access is granted.

Respectfully submitted,

*[signature]*

Robert Trent | Pro Se Plaintiff

7510 88th St., Lubbock, TX 79424

robert.trent0139@gmail.com | (806) 507-1592

November 3, 2025

Robert Trent
7510 88th St.
Lubbock-TX-79424

CLERK OF THE COURT
US District Court - Northern District
of Texas - Lubbock Division.
1205 Texas Avenue, Room 209
Lubbock TX- 79401

RECEIVED NOV – 6 2025
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

RECEIVED NOV – 6 2025
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**RETURN RECEIPT REQUESTED**

CERTIFIED MAIL
9589 0710 5270 2617 1902 18

Retail
RDC 99

U.S. POSTAGE PAID
FCM LG ENV
LUBBOCK, TX 79464
NOV 03, 2025
$12.42
S2324H500514-03

79401