UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

FILED
August 28, 2026
KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

| | | |
|---|---|---|
| ROBERT TRENT, Plaintiff, | § | |
| | § | Case 5:25-cv-00176-H-BV |
| v. | § | |
| | § | |
| CAPELLA UNIVERSITY, LLC, Defendant. | § | |

# PLAINTIFF'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

***Use of Generative Artificial Intelligence:*** *Pursuant to Local Civil Rule 7.2(f), Plaintiff discloses that generative artificial intelligence was used in the preparation of this filing.*

## INTRODUCTION

This action seeks relief for disability discrimination, whistleblower retaliation, evidence tampering, and interference with federally protected rights.

Plaintiff Robert Trent was an Academic Coach at Defendant Capella University from August 28, 2023 to March 12, 2025. For eight consecutive months, he performed at above-average metrics with no corrective action. Within 32 days of disclosing his disabilities on April 12, 2024, Defendant began disciplining him for communication traits it had previously evaluated favorably—applying customer service standards absent from his job description and never added by amendment.

Within 24 hours of Plaintiff's June 4, 2024 accommodation request, Associate Manager Caitlin McHugh responded in writing that the expectations at issue "would not change, even with a potential accommodation"—before any interactive dialogue occurred. Defendant then imposed a formal process with a 15-day psychiatric documentation deadline in a federally designated mental health provider shortage area, automatic closure if missed, and McHugh as final approver. The process was structurally designed to prevent any accommodation from being granted.

Beginning in October 2024, Plaintiff filed formal reports with federal and state regulators alleging Defendant's misuse of Title IV funds. On February 26, 2025, he sent formal whistleblower notice to HR and supervisors. 14 days later, Defendant terminated him, did not contest unemployment, did not cite a policy violation, and wrote "Details not available" in its unemployment filing. Post-termination events have validated the merits of Plaintiff’s claims: the U.S. Department of Justice referred his civil rights complaint to its Disability Rights Section, The Department of Education escalated his Title IV complaint for research and review, and

Congressman Jodey Arrington initiated multiple congressional inquiries into Plaintiff's whistleblower activities.

The adverse actions establishing Defendant's discriminatory framework were fully constructed before Plaintiff's first whistleblower report—a period during which disability was necessarily the sole operative variable, and was escalated with each protected activity.

The timeline, Defendant's own internal communications, binding litigation concessions, and post-termination regulatory actions independently corroborate every element of Plaintiff's claims.

**JURISDICTION AND VENUE**

This Court has federal question jurisdiction over Plaintiff's claims under the Americans with Disabilities Act (ADA), the False Claims Act (FCA), and Section 504 of the Rehabilitation Act pursuant to 28 U.S.C. § 1331.

Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District. Plaintiff performed all work duties remotely from his home in Lubbock County, Texas. Defendant directed its employment actions, communications, accommodation denials, retaliatory discipline, and termination decisions into this District.

Plaintiff has satisfied all administrative prerequisites. He filed Charge No. 31C-2025-00583 with the Equal Employment Opportunity Commission (EEOC) and received a Notice of Right-to-Sue on August 11, 2025. The original Complaint was timely filed within 90 days of receipt of said notice.

**PARTIES**

Plaintiff Robert Trent is an individual and resident of Lubbock County, Texas. He was employed by Defendant as an Academic Coach from August 28, 2023, to March 12, 2025. Plaintiff has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and Autism Spectrum Disorder (ASD).

Defendant Capella University, LLC is a for-profit educational institution wholly owned by Strategic Education, Inc. ("SEI"). At all relevant times, Defendant was an "employer" within the meaning of the ADA, employing 15 or more individuals.

Defendant is a recipient of federal financial assistance, including approximately $319 million in Title IV funds in the 2020–2021 fiscal year, making it a "program or activity" subject to Section 504 of the Rehabilitation Act and the False Claims Act.

**DEFENDANT'S JUDICIAL ADMISSIONS**

In prior administrative proceedings and formal pleadings before this Court, Defendant has formally and bindingly conceded the following facts, which require no further proof. These admissions derive from three sources: (1) Defendant's Objections and Responses to Plaintiff's First Set of Requests for Admission ("RFA Resp.")[1]; (2) Defendant's EEOC/TWCCRD Position Statement No. 31C-2025-00583, filed as Dkt. No. 43-1 ("EEOC Pos. Stmt."); and (3) representations made by Defendant's counsel in filings before this Court ("Def. Briefing"). The specific source for each admission is identified parenthetically.

**Job Description and Evaluation Standards**

- The term "customer service" does not appear in the Academic Coach job description. (RFA Resp. No. 73: "Admitted as stated.")
- The term "supporting the brand" does not appear in the Academic Coach job description. (RFA Resp. No. 75: "Admitted as stated.")
- Serving as an "intermediary" does not appear in the Academic Coach job description. (RFA Resp. No. 74: "Admitted as stated.")
- The Academic Coach job description does not state that Academic Coaches will be evaluated primarily on customer-satisfaction scores. (RFA Resp. No. 77: "Admitted as stated.")
- Defendant never amended the Academic Coach job description to add a customer-service communication standard during Plaintiff's employment. (RFA Resp. No. 78: "Admitted as stated.")
- The Academic Coach job description requires "exercising keen discretion and ethical judgment." (RFA Resp. No. 76: "Admitted.")

**Disability Disclosure and Discipline Timeline**

- On April 12, 2024, Plaintiff sent a Teams message to his supervisor Caitlin McHugh referencing his ADHD. (RFA Resp. No. 26) Even under Defendant's own characterization, this communication placed Defendant on notice that Plaintiff had ADHD. Defendant separately admits that Plaintiff disclosed ADHD during a May 22, 2024 meeting with McHugh. (EEOC Pos. Stmt., Dkt. 43-1, pg. 6)
- Plaintiff received his first formal Corrective Action Form after April 12, 2024. (RFA Resp. No. 27: "Capella admits.")
- Plaintiff did not receive a formal Written Warning prior to the Final Written Warning. (RFA Resp. No. 107: "Capella admits that Plaintiff did not receive a formal 'Written Warning' document.")

**Accommodation Request and Interactive Process**

- "On June 21, 2024, Mr. Trent submitted a request for an ADA accommodation." (EEOC Pos. Stmt., Dkt. 43-1, pg. 7)

---

[1] The full exhibit list for RFAs are on the docket at 42

- On June 21, 2024, Defendant required Plaintiff to return the accommodation form within 15 calendar days or the request would be "considered closed." (RFA Resp. Nos. 52-53: "Capella admits" to both the deadline and the closure consequence.)
- Defendant's accommodation determination process included "consulting with your department leadership," and Plaintiff's department leadership at that time was Caitlin McHugh. (RFA Resp. Nos. 54-55: "Capella admits" to both the quoted language and that McHugh was Plaintiff's supervisor as of June 21, 2024.)
- Within 24 hours of Plaintiff's June 4, 2024 accommodation request, McHugh stated in writing that "the role expectation of professional communication at all times with learners would not change, even with a potential accommodation." (RFA Resp. No. 49: "Capella admits"; RFA Resp. No. 50: "the referenced exchanges did occur within 24 hours of one another.")
- Defendant's EEOC position statement admits McHugh told Plaintiff he "could not speak to learners the way that he did and could not intentionally disconnect learner calls." (EEOC Pos. Stmt., Dkt. 43-1, pg. 5)
- No Performance Improvement Plan was ever issued to Plaintiff. (RFA Resp. No. 56: "Admitted.")

**February 5, 2025 Call Reviews and Comparators**

- Defendant's call review by Supervisor Olsen (Dkt 42-1; Exhibit X) does not attribute the statement "I don't know what the university is getting paid for" to Plaintiff. (RFA Resp. No. 43: "Capella admits that the characterization of Exhibit X is accurate.")
- Director RT Taylor confirmed in writing that he "listened to the call." (RFA Resp. No. 39: "Capella admits.")
- Defendant did not amend its correspondence to Plaintiff regarding the misattribution after Plaintiff's written objection on February 10, 2025. (RFA Resp. No. 40: "Capella admits.")
- The BPC assessment was conducted "unbeknownst to" Associate Manager Olsen. (RFA Resp. No. 41: "Capella admits only that the representation is made in Plaintiff's Exhibit G.") (Dkt. 42-1; Exhibit G)
- Olsen's call review stated "The learner call and feedback has been forwarded to HR for review" and "They will reach out to early next week." HR did not contact Plaintiff regarding the February 5 call. (RFA Resp. Nos. 44-45: "Capella admits" to both.) Dkt. 42-1; Exhibit X)
- Colin Hanzel did not receive a Corrective Action Form and had not disclosed a disability to or requested an accommodation from Human Resources as of February 5, 2025. (RFA Resp. Nos. 58-59: "Capella admits.")
- Monile Bell-Malaaleu stated "if you want to leave the university, absolutely" in the presence of Deanna Olsen, was not disciplined, and had not disclosed a disability to or requested an accommodation from Human Resources as of February 12, 2025. (RFA Resp. Nos. 60-62, 64: "Capella admits" to each.)

**FlexPath Transcripts and Grade Issues**

- Defendant's FlexPath translated transcript is designated an "unofficial document." (RFA Resp. No. 89: "Admitted.")
- Baylor University required an official transcript, declining the unofficial FlexPath translated transcript. (RFA Resp. No. 90: "Capella admits.")
- Academic Faculty Director Dr. Darleen Barnard stated in writing on January 13, 2025: "It is my understanding that we can't do grade changes for FlexPath," and on January 10, 2025: "The last time we tried to do this for a FlexPath course, we weren't able to do it." (RFA Resp. Nos. 86-87: "Capella admits that the statement is attributed to Darleen Barnard on that date.")
- Students withdrawn for non-engagement may be subject to Return to Title IV (R2T4) calculations. (RFA Resp. No. 84: "Admitted.")
- Defendant certifies compliance with federal statutes and regulations relating to the maintenance of accurate student records as a condition of Title IV participation. (RFA Resp. No. 88: "Capella admits.")

**SCR Webpage Removal**

- On or around January 14, 2025, Defendant retired the internal webpage containing Special Credit Request information from the student-facing Campus platform. (RFA Resp. No. 91: "Capella admits.")
- The words "leadership decided they no longer want it on campus" appear in the documented exchange attributed to Colin Hanzel. (RFA Resp. No. 92: "Capella admits those words appear in Exhibit L.")
- The SCR process "remains available to learners as an escalation pathway despite not being outlined on Campus." (RFA Resp. No. 93: "Capella admits.")

**Contractual Guarantees Regarding Protected Activity**

- Defendant’s New Hire Agreement guarantees that nothing in the Agreement will “prevent, impede, or interfere with” Plaintiff’s right to initiate communications with or provide information to “any Federal, State, or other regulatory authority in the course of an investigation or proceeding authorized by law,” and that nothing in the Agreement will “restrict [Plaintiff’s] legally protected right to… any whistleblower act.” The Agreement separately provides the federal Defend Trade Secrets Act safe harbor for disclosures made to government officials for the purpose of reporting suspected violations of law. (New Hire Agreement, DocuSign Envelope ID: 5CAB84FE-5E46-4FEF-9CDC-7A08B8E7E2C7)

- Defendant’s contractual language — “prevent, impede, or interfere with” — mirrors the statutory language of 42 U.S.C. § 12203(b), which makes it unlawful to “coerce, intimidate, threaten, or interfere with” the exercise of ADA-protected rights. (New Hire Agreement; 42 U.S.C. § 12203(b))

**Termination and TWC Filing**

- Director RT Taylor sent the Microsoft Teams messages depicted in Exhibit D; Dkt 42-1, and deleted the message timestamped 9:26 AM. (RFA Resp. Nos. 23-24: "Capella admits.")
- "S.D." refers to Stephanie Dorceant, whose employment ended in or about March 2025. (RFA Resp. No. 104: "Capella admits.")
- HR closed its investigation on March 11, 2025, concluding "no evidence of harassment, retaliation, or discrimination." Plaintiff was terminated on March 12, 2025. (RFA Resp. Nos. 100-102: "Admitted.")
- Defendant's TWC SIDES Employer Response (Exhibit E; Dkt. 42-1) selected "Not Qualified" as the reason for discharge or separation, listed "Details not available" for the final incident, did not identify by name or number any specific policy Plaintiff allegedly violated, stated in the narrative that Plaintiff "was discharged for unsatisfactory work performance," and Defendant elected not to contest Plaintiff's unemployment claim. (RFA Resp. Nos. 66-67, 69-70: "Capella admits")
- No written policy name or number was communicated to Plaintiff during the March 12, 2025 termination meeting. (RFA Resp. No. 70: "Admitted as stated.")
- The Manager Evaluation narrative section of Plaintiff's 2024 performance review was not completed. (RFA Resp. No. 71: "Capella admits.")

**Litigation Representations**

- The authentic June 4, 2024 Corrective Action Form bearing Plaintiff's signature and comments "was clearly preserved and, indeed, is on the record before this Court." (Def. Briefing, Dkt. No. 28, pg. 7)
- Defendant cited temporal proximity of up to four months as sufficient to establish a causal link, relying on *Jurach v. Safety Vision, LLC*, 72 F. Supp. 3d 698, 712-713 (S.D. Tex. 2014), and stating: "The Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link." (EEOC Pos. Stmt., Dkt. 43-1, pg. 11)
- Capella University was named as an institution in the *Sweet v. (Cardona) McMahon* matter, and learners who filed Borrower Defense applications could be included in the automatic relief group. (RFA Resp. Nos. 116-117: "Capella admits.")

## FACTUAL ALLEGATIONS

### A. Plaintiff's Successful Performance as Academic Coach (August 2023 – April 2024)

On August 28, 2023, Plaintiff began employment with Defendant as an Academic Coach. The official Academic Coach job description required "transformational conversations" designed to challenge learners, coaching, mentoring, and helping learners make fully informed decisions about their academic paths, as well as exercise "keen discretion and ethical judgment."

From August 2023 through April 2024, Plaintiff consistently received positive learner feedback, maintained above-average performance metrics (including over 4,600 calls in 2024, resulting in an expanded learner caseload of 651 students at the time of his termination), and successfully performed the essential functions of his position. No corrective action was issued during this eight-month period.

During the disciplinary period that followed his April 12, 2024 disability disclosure, students Plaintiff coached were achieving documented outcomes and describing their experiences in writing to Capella's own staff. In August 2024, during Plaintiff's first round of Behavioral Performance Coaching, learner KR wrote: "Thank you for all your help and advice... posing questions that challenged how I perceive and navigate this grad school journey." In December 2024, learner TJ wrote to notify Plaintiff she received the Presidential Lifetime Achievement Award: "you really gave me the push I really needed to succeed." In January 2025, learner SM—a hospital chaplain managing simultaneous family bereavement and a spousal mental health crisis—called Plaintiff in acute distress. Plaintiff identified the underlying barriers, engaged in prayer when the student referenced her faith, and advised her to drop her course and re-enroll under her employer's tuition policy, exercising precisely the "keen discretion and ethical judgment" the official job description requires. SM described Plaintiff's handling as "earth angel…empathic listening, understanding... an honest, practical, realistic, and responsible way forward." Capella's own Associate Enrollment Counselor Hector Gutierrez forwarded SM's praise for Plaintiff internally, writing: "Thought you should see it."

These outcomes are just a small sample of a broader pattern that establishes that Plaintiff was performing the transformational coaching functions his job description required at the precise moment Defendant was disciplining him for those same functions. Defendant made no reference to any of these calls in either performance evaluation or termination.

That Defendant was simultaneously disciplining the coaching approach these students described as transformational is direct evidence that the standard applied to Plaintiff was not the standard in his job description.

**B. Disability Disclosure and Immediate Adverse Action (April 12 – June 4, 2024)** On April 12, 2024, Plaintiff disclosed his ADHD diagnosis to his direct supervisor Caitlin McHugh. Immediately following the disclosure, Defendant shifted Plaintiff's evaluation framework. While his title remained Academic Coach, Defendant began evaluating him against customer service standards absent from his job description — standards that Defendant has formally admitted do not appear in the Academic Coach job description and were never added by amendment.

These are different jobs with different communication requirements. Transformational coaching requires one to "highlight and address potential barriers that may impact persistence, success and completion" as well as exercising "keen discretion and ethical judgment"—functions that sometimes require direct, challenging, and uncomfortable conversations. Customer service requires managing satisfaction regardless of whether the customer is correct.

Within 32 days of his disclosure, Defendant cited Plaintiff for "speaking rudely" to learners—conduct evaluated solely against the newly-imposed customer service standard and directly tied to the autism-related direct communication traits the official job description had previously rewarded. He was escalated directly to a final written warning, bypassing Defendant's own progressive discipline policy entirely.

**C. Defendant's Pre-Determined Refusal and Structurally Impossible Accommodation Process** On June 4, 2024, Plaintiff wrote in the employee comments section of the Corrective Action Form, directly below his disclosure of ADHD and ASD diagnoses: "This is not an indication or admission of inability to perform job related duties but rather to convey my needs for accommodation." By writing this, Plaintiff formally initiated the interactive process to determine reasonable accommodations.

Within 24 hours, before any interactive dialogue occurred, Associate Manager Caitlin McHugh responded in writing: "the role expectation of professional communication at all times with learners would not change, even with a potential accommodation." Defendant's own EEOC position statement further admits McHugh told Plaintiff he "could not speak to learners the way that he did and could not intentionally disconnect learner calls"—an absolute prohibition with no exceptions. This was not a preliminary position. It was a statement of finality, an institutional determination delivered before the process began, communicating that no accommodation would be explored regardless of what the interactive process produced.

On June 12, 2024, Plaintiff escalated a formal accommodation inquiry to HR. On June 21, 2024, HR implemented a formal process requiring a completed form from a medical provider, filled out "in its entirety," within exactly 15 calendar days, or the request would be considered closed. Any accommodation determination would involve consulting with department leadership, and department leadership included Caitlin McHugh—the same individual who had already declared the outcome 16 days earlier.

The 15-day deadline was not achievable. Lubbock County is federally designated as a mental health provider shortage area. Even if Plaintiff had cleared that barrier, any resulting accommodation would have been evaluated by McHugh—who had already declared in writing that no accommodation would change the expectations at issue. The deadline ensured Plaintiff could not complete the process. The approver ensured that if he did, the outcome was already determined. Together they designed a process that could not produce a good-faith result, causing the complete breakdown of the interactive process before it could reach the collaborative stage at which specific accommodations would have been identified.

Defendant's own EEOC/TWCCRD position statement expressly admits: "On June 21, 2024, Mr. Trent submitted a request for an ADA accommodation." Defendant cannot simultaneously argue in this litigation that Plaintiff never made a specific accommodation request while admitting to a federal civil rights agency that one was submitted.

**D. Reasonable Accommodations That Would Have Enabled Performance** The following accommodations became necessary only after Defendant shifted Plaintiff's evaluation framework to customer service standards following his April 12, 2024 disability disclosure. Each addresses a specific barrier created by that shift. Each is tied to a specific incident Defendant used as a basis for discipline. None would have required Defendant to eliminate any essential function of the coaching role as defined in the official job description.

**(a) Structured Call Disengagement Protocol.** Defendant's own EEOC position statement admits McHugh told Plaintiff he "could not intentionally disconnect learner calls" under any circumstances. This absolute prohibition applied regardless of whether a learner was abusive, threatening, or had already escalated beyond any coaching purpose. It is not a coaching requirement—it is a customer service requirement imposed on a coaching role without job

description amendment, materializing only after Plaintiff's disability disclosure. A supervised disengagement protocol—permitting Plaintiff to end calls that had passed any reasonable coaching purpose, with supervisor notification and a documented re-engagement plan—would have kept the role within the boundaries of the position Plaintiff was hired to perform. It requires no structural change other than replacing an absolute prohibition with a supervised protocol.

**(b) Written, Defined Performance Standards.** On February 7 2025, Plaintiff was disciplined for a statement a learner made, not Plaintiff—a misattribution Defendant's own parallel call review does not support and that Defendant never corrected after its leadership reviewed the audio. Plaintiff was separately cited for accurately informing a learner that FlexPath grades function as pass/fail; Defendant's own records confirm the FlexPath translated transcript is an unofficial document rejected by Baylor University for graduate admissions. Defendant promised corrective training and never provided it—because Plaintiff was correct and no correction was possible. Both incidents share the same root cause: Defendant evaluated Plaintiff against standards it never defined in writing, applied them retroactively, and refused to correct the record when the error was documented. Written performance standards defining in advance how Academic Coaches should handle transcript limitations, program fit discussions, and institutional inquiries would have directly prevented both incidents.

**(c) Advance Written Agendas for Performance Meetings.** On February 24, 2025, HR personnel Damon Dodson wrote at 2:55 PM that Plaintiff was "probably trying to seek legal counsel." The performance review scheduled for the following day was moved up and delivered that same afternoon—a same-day acceleration executed specifically in response to management's conclusion that Plaintiff was seeking legal counsel, confirmed by two HR decisionmakers in writing. Providing written agendas before performance and disciplinary meetings would have ensured that meetings addressed actual performance issues through a process Plaintiff could engage with accurately and effectively, rather than through surprise confrontations designed to disadvantage Plaintiff at a moment management had identified as legally sensitive.

**(d) Reassignment to Academic Success Specialist.** On January 25, 2025, Plaintiff applied for a vacant Academic Success Specialist position. The essential duties included providing "academic support services, including coaching and webinars" and designing "academic content." The position required a Bachelor's degree in English, mathematics, statistics, secondary education, or a "closely related discipline"; a "strong academic background in writing" alongside mathematics, statistics, or research methods; and "3-5 years of experience teaching... adult learners, preferably in an online setting."

Plaintiff's qualifications directly aligned with and exceeded these requirements. He held Bachelor's degrees in Biology, Chemistry, and Health Sciences, and had at the time, completed 24 graduate hours toward a Master of Science in Applied Mathematics, including statistics and experimental design coursework. He is a published author, satisfying the "strong academic background in writing" requirement. He possessed over ten years of experience teaching and coaching adult learners in an online setting, far exceeding the requisite three to five years.

The position centered on independently designing academic content and providing subject-matter-based coaching evaluated against objective criteria—duties paralleling the functions Plaintiff successfully executed during his initial eight months of above-average performance. Despite being qualified, Defendant denied Plaintiff's application without an interview on

February 3, 2025, nine days after submission. Reassignment to a vacant position for which an employee is qualified is a recognized form of reasonable accommodation.

**E. Retaliatory Coaching, Flawed Call Reviews, and Disparate Treatment (July 2024 – February 2025)** Shortly after Plaintiff's June 12, 2024 formal accommodation request, Defendant placed Plaintiff into an initial round of Behavioral Performance Coaching without any written plan, metrics, or documentation. On October 17, 2024, Defendant imposed a second round under explicit threat of termination. Both rounds focused on altering Plaintiff's autism-related communication traits rather than engaging in the interactive process or providing reasonable accommodations.

**The February 5, 2025 Call.** On February 5, 2025, Plaintiff handled an escalated call from learner GM, who was already frustrated because peer Academic Coach Colin Hanzel had failed to appear for her scheduled appointment in direct violation of Defendant's policy. Hanzel received no Corrective Action Form for this violation and had never requested an accommodation or disclosed a disability.

Nine days before this call, Plaintiff handled the crisis call from learner SM described in Section A. Plaintiff provided prayer, crisis support, and practical planning, and Capella's own enrollment personnel forwarded SM's praise internally. Nine days later, Defendant disciplined Plaintiff for his handling of a call escalated by a colleague's policy violation, using the identical coaching approach Capella's own staff had internally documented and circulated as exemplary. The intervening variable was not Plaintiff's conduct—it was Hanzel's policy violation, which created the hostile conditions of the call.

Hanzel then directed Supervisor Olsen to escalate Plaintiff's handling of the learner GM call to HR on or about February 7, 2025, before Plaintiff had been consulted and before any formal assessment had been prepared. The result was that the incident entered the HR record framed entirely by the colleague whose conduct had triggered it. Olsen's written review, provided only after HR escalation, promised Plaintiff that HR would contact him early the following week. HR never did.

**The Unsolicited BPC Assessment.** On February 10, 2025, Olsen forwarded a Behavioral Performance Coaching assessment of the aforementioned February 5, 2025 call with learner GM to Plaintiff, stating: "Unbeknownst to me, Lindsey Nielson, BPC did a call review of the call we discussed last Friday today. She sent it to me this morning." The assessment was not requested by Olsen, was not part of standard procedure, and was prepared three days after Olsen had already escalated to HR. The BPC assessment attributed the statement "I don't know what the university is getting paid for" to Plaintiff in the Performance Expectations Violations section. That statement was made by learner GM, not by the Plaintiff. Olsen's own separate call review of the same call does not attribute that statement to Plaintiff—establishing two conflicting versions of the same call in Defendant's own administrative record. Plaintiff raised the misattribution in writing on February 10, 2025. Director RT Taylor confirmed in writing that same day that he had listened to the call. Despite written communication of this misquote, Defendant never amended the record.

**Olsen's Call Review.** In her separate review, produced after HR escalation, Olsen cited Plaintiff for two statements: (i) "Do you want to stay in the program you are in? You could probably get

an MBA somewhere else." (ii) "For this program whether you get proficient or distinguished does not matter—a passing grade is a passing grade."

Regarding statement (i), Olsen wrote: "This is not appropriate. Disparaging Capella violates the AC WFH guide." Regarding statement (ii), Olsen wrote: "Grading is not pass/fail—an understanding of this is required to be a FlexPath coach. Additional training can be provided for this topic." However, Plaintiff was correct. Defendant's own records establish that its FlexPath translated transcript is designated an unofficial document and was rejected by Baylor University for graduate admissions. Defendant promised corrective training and never provided it because no correction was possible. No amendment was ever made to Nielson's or Olsen's review of the February 5 call.

Olsen further stated in the same review: "The issue is not empathy but the lack of upholding Capella as a reputable institution." This statement explicitly identifies the evaluation standard Defendant applied uniquely to Plaintiff: brand protection. This standard does not appear anywhere in the Academic Coach job description.

**Disparate Treatment.** On February 12, 2025, one week after Plaintiff's call and during Olsen's active escalation of his conduct, non-disabled colleague Monile Bell-Malaaleu stated in a meeting Olsen personally attended: "And I told her, hey, if you want to leave the university, absolutely." Bell-Malaaleu was never disciplined. Plaintiff's statement (i) "Do you want to stay in the program you are in? You could probably get an MBA somewhere else." — was an exploratory coaching question about goals, motivation, and program fit—the kind of "transformational conversation" the job description requires. The same supervisor actively escalating Plaintiff's coaching question to HR took no action against a non-disabled colleague of the same title (academic coach) who affirmatively told a learner that leaving was "absolutely" appropriate, in her direct presence. The only material distinction between Plaintiff and Bell-Malaaleu was Plaintiff's disclosed disabilities.

**F. Plaintiff's Protected Whistleblower Activity** Beginning in October 2024 and continuing through his termination, Plaintiff engaged in extensive protected activity by reporting to multiple regulatory authorities what he reasonably believed were systemic violations involving Defendant's misuse of federal Title IV funds, and by advocating for disabled students in the exercise of their ADA rights.

Plaintiff's belief was objectively reasonable and directly anchored in documented regulatory history. The U.S. Department of Education Office of Inspector General Final Audit Report ED-OIG/A05G0017 previously cited Defendant for systemic non-compliance regarding Title IV funds, including improper retention of unearned Title IV funds and R2T4 calculation issues. The Sweet v. Cardona class-action settlement identified Defendant as a named institution whose students were eligible for automatic Borrower Defense to Repayment (BDAR) loan discharges. Plaintiff's concerns arose during a period in which federal prosecutors had identified at least $9 billion in fraud across Minnesota-administered federal programs, prompting a House Oversight Committee investigation, with the U.S. Attorney characterizing Minnesota (Defendant's headquarters) as 'a national poster child for public corruption' in the stewardship of federal funds.

**1. CFPB Complaint — October 19, 2024.** Plaintiff filed formal complaint number 241019-16569662 with the Consumer Financial Protection Bureau alleging violations of the Higher Education Act for failure to timely disburse federal funds, violations of Regulation Z,

mismanagement of Post-9/11 GI Bill benefits, and system failures causing improper loss of federal financial aid. On October 22, 2024, the CFPB referred Plaintiff's complaint to the Federal Trade Commission.

**2. Federal Student Aid Complaint — February 7, 2025.** Plaintiff filed formal complaint FSA Case No. 27063670 with the U.S. Department of Education's Office of Federal Student Aid alleging Defendant's misuse of federal funds and misrepresentation of student rights material to Defendant's Title IV Program Participation Agreement obligations. On March 7, 2025, the Department of Education confirmed in writing that Plaintiff's complaint had been forwarded to another business unit for research and review.

**3. Minnesota Office of Higher Education Complaint — February 23-26, 2025.** Plaintiff filed a comprehensive complaint with the Minnesota Office of Higher Education, alleging violations of Minnesota Statute §§ 136A.822, 325F.69, and 136A.61; 34 C.F.R. §§ 668.22(d) and 668.72(c)(1); and 20 U.S.C. § 1094(a)(22). Plaintiff reported that Defendant had deliberately replaced its accessible Special Credit Request (SCR) refund webpage with an inaccessible PDF, violating ADA Title III, Section 508 of the Rehabilitation Act, and WCAG 2.1 AA Standards—creating barriers for disabled students seeking refund information at a federally funded institution.

Defendant admitted that on or around January 14, 2025, leadership made a deliberate decision to retire the SCR information page from the student-facing Campus platform as part of what Defendant described as 'a larger effort to continue to improve Capella's approach to student complaints.' Defendant's own employee Colin Hanzel documented the operational reason in writing: 'leadership decided they no longer want it on campus.' Defendant further admitted that the SCR process continued to exist internally after its removal — creating a two-tier system in which access to federally regulated refund rights depended on whether a student happened to reach an informed staff member (who was willing to escalate) rather than on equal platform access. Defendant characterized this remaining pathway as an 'escalation mechanism' — confirming that access to federal refund rights was deliberately restructured to require institutional gatekeeping at every step. Defendant did not describe the SCR page as a student resource. It described student refund requests as 'complaints' to be managed through an 'approach' it was 'continuing to improve.' An institution that frames federally regulated refund entitlements as complaints — and removes the mechanism by which students could independently access those rights at the moment defendant knew disaster-affected students most needed them — has not improved student access.

Hurricanes Helene and Milton made landfall on September 26 and October 9, 2024, respectively. Disaster-affected students in the acute phase of recovery were managing survival needs, not student portal inquiries. The three-to-four month window following a major disaster is precisely when displaced individuals stabilize sufficiently to begin addressing institutional obligations and seeking relief they could not pursue during the emergency. Defendant removed the SCR information page at the precise moment hurricane-affected students would have been re-engaging with Capella to seek the refund rights they had been unable to pursue during the disaster period. The removal ensured that the students most likely to need SCR information were the least likely to find it. This structure disproportionately harmed disabled students who depend on accessible digital formats to navigate institutional processes. An institution that deliberately removes the mechanism by which students access their R2T4 refund rights — while retaining the

process internally as a gatekept escalation pathway — engages in conduct that Plaintiff reasonably believed was aimed at reducing federally-mandated refund obligations.

This conduct did not occur in a vacuum. The ED-OIG Final Audit Report ED-OIG/A05G0017 previously cited Defendant for systemic non-compliance involving improper retention of unearned Title IV funds and R2T4 calculation issues — the exact mechanisms implicated by the SCR removal. Defendant's pattern of structuring student-facing processes to minimize Title IV refund obligations while continuing to certify federal compliance is documented institutional history repeating itself.

The complaint also documented a systemic grade integrity violation. In December 2024 through January 2025, Academic Faculty Director Dr. Darlene Barnard confirmed in writing: "It is my understanding that we can't do grade changes for FlexPath" and "The last time we tried to do this for a FlexPath course, we weren't able to do it"—while Defendant continued certifying compliance with the record-keeping requirements of its Title IV Program Participation Agreement under 34 C.F.R. §§ 668.14 and 668.34.

**4. Internal Report of Fraudulent Refund — December 2024.** Between December 18 and 20, 2024, Supervisor Deanna Olsen instructed Plaintiff to prepare a Special Credit Request (SCR) for learner TB. Plaintiff investigated the request and reported to Ms. Olsen in writing that the claim was factually unsubstantiated, identifying four specific indicia of fraud: (1) The student's complaint referenced an employee named "Alberto" who did not exist; (2) The student claimed a CrowdStrike outage prevented receipt of emails, but BCC records confirmed outgoing communications were successfully transmitted; (3) No timestamped documentation existed to substantiate the claim; and (4) No correspondence existed to corroborate the student's claim of a deleted appointment.

Plaintiff wrote: "I think they are lying to get out of paying for a billing session." Despite receiving this documented evidence of fraud, Ms. Olsen overruled Plaintiff's objections and ordered him to prepare the SCR for approval.

Critically, Plaintiff’s written objection identified Olsen's institutional directive—not the student's underlying dishonesty—as the source of the fraud. Because Defendant is a Title IV institution, processing a Special Credit Request is not merely an internal accounting measure. It automatically triggers a mandatory Return to Title IV (R2T4) recalculation under 34 C.F.R. § 668.22. By overriding Plaintiff's evidence and directing the approval of a known fraudulent request, Olsen guaranteed that Defendant would submit a false R2T4 adjustment directly to the federal government.

Plaintiff’s written report put Defendant on actual notice that its own supervisor was directing a process that would misappropriate federal Title IV money—making Defendant, not the student, the entity actively defrauding the United States.

This incident did not occur in isolation. Weeks earlier, the same supervisor rigidly denied a legitimate SCR for a hurricane victim—requiring that "the dates line up" with the FEMA declaration—while here approving a facially unsubstantiated request over her subordinate's documented fraud objections. This contrasting treatment is a representative sample of a broader institutional practice of the arbitrary and discriminatory application of Title IV refund policies that formed the basis of Plaintiff's reports to federal and state regulators.

**5. Advocacy for Legally Blind Student — February 25, 2025.** Plaintiff spoke with a legally blind student whom Defendant's own Student Disability Services department had told she did not need accommodations, despite her explicit request. Plaintiff advised this student of her right to file a complaint with the U.S. Department of Education's Office for Civil Rights regarding Defendant's denial of her accommodation request.

**6. Defendant's Internal Recognition and Formal Whistleblower Notice — February 26, 2025.** By February 26, 2025, Defendant had independently recognized Plaintiff's protected activity through its own leadership—before Plaintiff ever sent his formal whistleblower notice.

At 12:25 PM on February 26, 2025, Director RT Taylor forwarded Plaintiff's prior email discussing Borrower Defense to Repayment ("BDAR") discharges to HR Employee Relations Specialist Angela Larson. BDAR is a federal regulatory mechanism under 34 C.F.R. § 685.206 through which students defrauded by their institution may seek discharge of federal student loans—exposing institutional liability for the return of Title IV funds. In his forwarding message, Taylor characterized the BDAR content as Plaintiff's "legal statement (not question)"—not a coaching concern, not a performance matter, but a legal statement requiring HR escalation. In the document as filed on this Court's docket (Dkt. No. 43-1, Page 91), two paragraphs discussing BDAR discharges, lawsuits, and Defendant's legal challenges appear in yellow highlighting while the surrounding text does not.

Later, at 5:44 PM on the same day, Plaintiff sent formal notice to the same supervisors — Olsen and Taylor — copying SEI HR People Operations, with the subject line: "Formal Notice of Legal Violations and Protected Whistleblower Disclosure." The email explicitly bifurcated Plaintiff's concerns into two distinct categories. First, Plaintiff documented his disability-related claims: "immediately after disclosing my disability, I began experiencing escalating scrutiny, selective policy enforcement, and disciplinary actions inconsistent with past expectations." Second, and separately, Plaintiff put Defendant on notice of legal violations beyond his personal treatment: "I want to make it clear that my concerns extend beyond how I have been treated based on my disability. I have firsthand knowledge of serious legal violations that leadership is aware of. These matters have been reported and I strongly advise immediate compliance with all applicable laws and regulations." The email further stated: "I also want to formally document that I engaged in protected whistleblower activity on February 7, 2025," (the date of Plaintiff's FSA complaint) and expressed that Plaintiff "fear[ed] retaliation for participating in a whistleblower activity in good faith."

Defendant terminated Plaintiff 14 days later, for allegedly being "not qualified" after 18 months of above average performance as an academic coach. Marking "details not available" for the final incident, without citing any policy violations, and without even providing a termination letter on March 12.

**G. Document Tampering, Forgery, and Evidence Destruction 1. Email Account Lockout — February 7-10, 2025.** On February 10, 2025 — days after Plaintiff filed FSA Case No. 27063670 with the U.S. Department of Education — Defendant disabled email forwarding on Plaintiff's institutional Outlook account for 33 hours without notice. Defendant's own New Hire Agreement expressly guaranteed that nothing in the agreement would "prevent, impede, or interfere with" Plaintiff's right to initiate communications with federal regulatory authorities or restrict his "legally protected right to… any whistleblower act." Plaintiff was exercising those

contractually guaranteed rights through the only employer-provided communication channel available to him as a fully remote employee at the moment Defendant disabled it.

**2. Material Alteration of Personnel Records.** On February 21, 2025, Plaintiff requested his official personnel file pursuant to Minnesota Statute § 181.961. The following sequence is established by Defendant's own internal communications between HR personnel and Workday audit trail:

- February 24, 2:55 PM: Damon Dodson writes Plaintiff is "probably trying to seek legal counsel."
- February 25, 10:35:50 AM: Dodson uploads 'Robert Trent CAF (1).pdf' to Plaintiff's Workday account[2]—the first and only time a Corrective Action Form had ever been uploaded to Plaintiff's Workday profile, more than eight months after the June 4, 2024 corrective action.
- February 25, 3:54 PM: Dodson tells colleague Ashley Washington "He requested Employee Records."
- February 25, 3:59 PM: Washington confirms CAFs are not standard personnel file contents, identifying the standard file as the job profile, offer letter, and new hire agreement.
- February 25, 4:02 PM: Dodson terminates the written exchange and requests an off-record verbal call.
- February 28: Backdated CAF produced as Plaintiff's official record.

Dodson uploaded the Backdated CAF at 10:35:50 AM EST—before consulting anyone about what belonged in a personnel file. Hours later, he learned CAFs are not part of the standard workflow. Three minutes after learning this, he went off-record.

The document Defendant produced in response to Plaintiff's request is dated May 28, 2024—seven days before the actual disciplinary meeting occurred—and bears no signature from Plaintiff. The authentic June 4, 2024 CAF that Plaintiff signed contained his disability disclosure, his accommodation request, and the comment: "This is not an indication or admission of inability to perform job related duties but rather to convey my needs for accommodation." The produced version (Exhibit A; Dkt. 42-1) contained none of these.

In their Motion to Dismiss, Defendant represented to this Court: "the Corrective Action Form with Plaintiff's signature and comments was clearly preserved and, indeed, is on the record before this Court." This representation constitutes a binding judicial admission that the authentic June 4, 2024 CAF was retained in defendants' possession. Defendant preserved the authentic record for the Court and produced the altered record to Plaintiff.

**3. Director RT Taylor's Spoliation.** At 9:26 AM on March 12, 2025—the morning of Plaintiff's termination—Director RT Taylor accidentally sent Plaintiff directly a Microsoft Teams message

---

[2] The '(1)' suffix is often automatically appended by operating systems when a duplicate filename is encountered, suggesting that 'Robert Trent CAF.pdf' was already present on the Defendant's systems at the time of the upload.

intended for his management team: "Hey everyone—based on our recent decision with Dee's other employee, should we reconsider our approach to S.D. on her team too?" "S.D." refers to Stephanie Dorceant, whose employment ended in or about March 2025. Taylor's message established that Defendant was engaged in a coordinated pattern of simultaneous terminations of protected class employees rather than individualized performance management.

During the audio-recorded termination meeting, Plaintiff directly confronted Taylor with the accidentally-received message. Taylor deleted the message from his native Microsoft Teams chat history in real time during that meeting. The audio recording captures Taylor explicitly stating: "I deleted my overall [teams] chat with you... period."

**H. The Accelerated and Pretextual Termination** On February 24, 2025, the following timestamped sequence is drawn entirely from Defendant's own internal communications:

- 2:12 PM: Dodson identified Plaintiff as "the employee who we are going to be putting on a PIP" and asked whether to pause delivery in response to Plaintiff's personnel file request.
- 2:54 PM: Sara Williams responds: "Oooh that's a good question. I think it's ok to still proceed with the PIP. But interesting he wants his file. He's the one we thought might quit, right?"
- 2:55 PM: Dodson responds: "Yes. It seems like he is probably trying to seek legal counsel."
- 2:56 PM: Dodson confirms the KWYS (performance review) remains scheduled for the following day.
- 3:43 PM: Williams instructs Dodson to consult a third HR decisionmaker identified as "Seth"[3] regarding Plaintiff's personnel file request, and to include the KWYS in the file once delivered.
- 5:19 PM: Dodson confirms the KWYS has been moved up same-day—less than three hours after two HR decisionmakers concluded Plaintiff was seeking legal counsel.
- 5:26 PM: Williams ratifies the acceleration.

At 2:56 PM, the review was still scheduled for the following day. By 5:19 PM it had been moved up. The only intervening event was Dodson's conclusion that Plaintiff was seeking legal counsel.

During the February 24, 2025 review, Defendant could not identify a single specific performance deficiency on demand. When Plaintiff asked for documented examples of allegedly missed learner appointments, Supervisor Olsen responded: "You have missed learner appointments and I will try to go back and find them." Director Taylor, evaluating performance against events he could not confirm had occurred, stated: "I can't confirm that right now. But I would bet that if you called in [sick] on a day, Robert... there were potentially appointments on those days." When Plaintiff continued to press for concrete examples, Taylor stated: "The demeanor of this

---

[3] Upon information and belief, 'Seth' in this exchange refers to Seth Lockner, Vice President of Human Resources, who signed Plaintiff's termination letter on March 13, 2025 — nineteen days after this consultation.

conversation is absolutely not what I was expecting. And I think this is a continuation of that professionalism that we're talking about" — converting Plaintiff's request for documentation of alleged misconduct into real-time evidence of additional misconduct.

Taylor simultaneously acknowledged during the same review: "Do you have more days of doing your job the appropriate way? Yes, you have a lot more days of that."

The Manager Evaluation section of the 2024 performance review KWYS document was left entirely blank. Plaintiff's own self-evaluation documented measurable improvements: task completion rate increased from 4.8 to 5.5 per hour, improved call quality, FERPA adherence, and growth handling escalated learners. Plaintiff was rated "Successfully Achieves Expectations" in Change Management, Resilience and Grit, Mindset, and Time Management.

Both Olsen and Taylor explicitly promised delivery of a Performance Improvement Plan (PIP). Taylor closed the meeting by stating: "I'm quite confident that after the performance plan is delivered... we'll lay everything out and then we'll be right beside you trying to help as much as we possibly can." 16 days later and 14 days after Plaintiff's formal whistleblower notice, Defendant terminated Plaintiff's employment, without issuing any PIP.

HR officially closed its internal investigation, prompted by Plaintiff’s whistleblower notice on March 11, 2025, concluding no evidence of harassment, retaliation, or discrimination — without ever interviewing Plaintiff. On March 7, 2025 — while the investigation remained open — Supervisor Olsen (one of the supervisors Plaintiff's February 26 whistleblower notice identified as having engaged in retaliation) forwarded a learner’s academic coach reassignment request directly to the investigator examining her own conduct. The details concerned a learner enrollment issue involving a specialized benefits processing requirement that does not appear anywhere in the Academic Coach job description (leaners using VA benefits had their own military support team). Plaintiff identified the specialized requirement and communicated it to the learner when it became apparent. Capella characterized policy-compliant handling of a situation outside the explicit scope of the Academic Coach role as a performance failure. For the subject of a discrimination investigation to be feeding adverse information about the complainant to the investigator, who then closes the investigation without interviewing the complainant one day before termination, is not a neutral process.

Plaintiff was terminated March 12, 2025 — exactly one day after HR closed its investigation without interviewing him, 16 days after his accelerated performance review, and 14 days after his formal whistleblower notice.

In its TWC SIDES Employer Response (Exhibit E; Dkt. 42-1), Defendant selected "Not Qualified" for reason of discharge. Wrote "Details not available" for the final incident leading up to discharge, identified no specific policy violation by name or number during the termination meeting, and elected not to contest Plaintiff's unemployment claim. Defendant had not prepared a termination letter until March 13, 2025 — one day after termination. On March 14, 2025, Defendant's parent company, Strategic Education, Inc., demanded PTO repayment contrary to written policy. Following Plaintiff's written rebuttal, Defendant abandoned the demand entirely without explanation.

**I. Damages** As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered: (a) lost wages and benefits; (b) loss of future earning capacity; (c) loss of professional

reputation; (d) garden variety emotional distress, including anxiety and humiliation; (e) costs and expenses of seeking new employment; and (f) litigation costs.

**COUNT I — AMERICANS WITH DISABILITIES ACT Disability Discrimination and Failure to Accommodate (42 U.S.C. § 12112)** Plaintiff incorporates all prior paragraphs by reference.

**Plaintiff Is a Qualified Individual With a Disability.** Plaintiff has been diagnosed with ADHD and Autism Spectrum Disorder. Both conditions substantially limit major life activities including, but not limited to, communicating, interacting with others, concentrating, and executive functioning, bringing Plaintiff within the ADA's protected class under 42 U.S.C. § 12102.

As established in Section A, Plaintiff successfully performed the essential functions of the Academic Coach position for eight consecutive months with above-average performance metrics and no corrective action. Defendant's post-disclosure imposition of unwritten customer service standards—standards legally conceded by Defendant to be absent from Plaintiff's job description—does not render Plaintiff unqualified for the position he successfully held.

**Standard Shift and Discrimination.** Defendant uniquely applied these unwritten standards to Plaintiff on the basis of his disability. As detailed in Section E, Defendant disciplined Plaintiff for coaching practices that were actively praised by internal staff, and ignored identical or more severe conduct when performed by non-disabled comparators Bell-Malaaleu and Hanzel. Supervisor Olsen explicitly identified the evaluation standard applied uniquely to Plaintiff: "The issue is… the lack of upholding Capella as a reputable institution"—a brand protection standard that does not appear in the Academic Coach job description.

**Breakdown of the Interactive Process.** Plaintiff's explicit June 4, 2024 written request for accommodation triggered Defendant's legal obligation to participate in a good-faith interactive process. Defendant's own EEOC position statement admits: "On June 21, 2024, Mr. Trent submitted a request for an ADA accommodation."

Defendant breached its duty to engage in the interactive process by issuing a written pre-determination of refusal within 24 hours—before any interactive dialogue occurred—followed by the imposition of a structurally impossible 15-day documentation process, as detailed in Section C. Defendant declared finality within 24 hours of Plaintiff's request, terminating the interactive process before reaching the collaborative stage at which specific accommodations would have been identified. The breakdown of the interactive process is traceable entirely to Defendant.

**Failure to Provide Reasonable Accommodations.** Defendant failed to provide the specific, reasonable accommodations outlined in Section D: a structured call disengagement protocol, written performance standards, advance written agendas for performance meetings, and reassignment to a vacant position for which Plaintiff exceeded the posted qualifications. Each accommodation addresses a specific barrier created by Defendant's post-disclosure standard shift without eliminating any essential function of the official coaching role.

**Pretext.** Defendant's stated reasons for its adverse actions are pretextual, demonstrated by: (1) selective enforcement of unwritten standards against Plaintiff while non-disabled comparators engaged in comparable or more severe conduct without discipline; (2) maintenance of a disciplinary record containing an uncorrected misattribution; (3) material alteration of Plaintiff's

official personnel file to eliminate his disability disclosure and accommodation request; (4) Director Taylor's real-time destruction of Microsoft Teams evidence during the termination meeting; (5) the absence of a documented policy violation at termination, Defendant's selection of "Not Qualified" on the TWC form, and certification of "Details not available"; and (6) a blank Manager Evaluation narrative, no PIP ever issued, and performance deficiencies evaluated against hypothetical events.

**COUNT II — AMERICANS WITH DISABILITIES ACT Retaliation (42 U.S.C. § 12203(a))** Plaintiff incorporates all prior paragraphs by reference.

**Protected Activity.** Plaintiff engaged in the following documented acts of protected activity under the ADA: (1) disclosing his ADHD and ASD diagnoses to his supervisor on April 12, 2024; (2) requesting specific accommodations in writing on June 4, 2024 and escalating a formal request to HR on June 12, 2024; (3) applying for reassignment to the Academic Success Specialist position on January 25, 2025; (4) objecting in writing on February 10, 2025 to the misattributed quote in his disciplinary record; (5) advising a legally blind student of her OCR complaint rights on February 25, 2025, as protected advocacy under 42 U.S.C. § 12203(b); and (6) filing the OHE web accessibility complaint on February 23-26, 2025.

**Adverse Employment Actions.** Following each act of protected activity, Defendant subjected Plaintiff to escalating adverse actions: citation for "speaking rudely" within 32 days of disclosure; a final written warning bypassing progressive discipline on June 4, 2024; undocumented Behavioral Performance Coaching in July 2024; a second round under threat of termination in October 2024; denial of reassignment without interview on February 3, 2025; an accelerated performance review on February 24, 2025; and termination on March 12, 2025.

**Causal Connection.** Causation is established through multiple independent lines of evidence:

*Temporal Proximity.* Every adverse action followed protected activity within days or weeks. Defendant terminated Plaintiff 14 days after his formal whistleblower notice and after his advocacy for a legally blind student. This 14-day gap satisfies the causal connection element of retaliation.

*Documented Staircase Pattern.* The sequence is documented and admitted: disclosure (April 12) → citation (May 14-20); accommodation request (June 4) → coaching (July 2024); reassignment application (January 25) → denial (February 3); personnel file request (February 24) → same-day accelerated review; blind student OCR advocacy (February 25) → termination (March 12); formal whistleblower notice (February 26) → termination (March 12).

*Direct Retaliatory Awareness.* On February 24, 2025, Dodson wrote at 2:55 PM that Plaintiff was "probably trying to seek legal counsel." One minute earlier the performance review was still scheduled for the following day. By 5:19 PM it had been moved up. A second HR decisionmaker ratified the acceleration at 5:26 PM. This establishes a timestamped sequence of HR decisionmakers accelerating an adverse action in direct response to their conclusion that Plaintiff was exercising his legal rights.

*Pretextual Termination.* Defendant's TWC SIDES response stated "Not Qualified" as the discharge reason, listed "Details not available" for the final incident, identified no violated policy, and elected not to contest unemployment.

*Judicial Record.* In its official EEOC Position Statement for this exact dispute (Dkt. 43-1, pg. 11), Defendant formally represented that temporal proximity of up to four months is sufficient to establish a causal link, explicitly citing *Jurach v. Safety Vision, LLC* to support its position. Defendant terminated Plaintiff just 14 days after his formal whistleblower notice—well within the window Defendant itself acknowledged on the record as establishing causation.

**COUNT III — FALSE CLAIMS ACT Retaliation (31 U.S.C. § 3730(h))** Plaintiff incorporates all prior paragraphs by reference.

**Protected Activity.** As a condition of receiving Title IV funds, Defendant executed a Program Participation Agreement ("PPA") under 34 C.F.R. § 668.14, requiring it to certify compliance with Title IV requirements as a condition of each disbursement. Plaintiff engaged in protected activity by formally objecting to, investigating, and reporting conduct he reasonably believed violated these obligations, thereby producing false certifications and reverse false claims material to Defendant's receipt of federal funds.

1. *CFPB Complaint — October 19, 2024 (No. 241019-16569662).* Plaintiff formally reported violations of the Higher Education Act, mismanagement of federally contracted Post-9/11 GI Bill benefits, and system failures causing improper loss of federal financial aid.
2. *Federal Student Aid Complaint — February 7, 2025 (FSA Case No. 27063670).* Plaintiff formally reported to the Department of Education's Office of Federal Student Aid systematic inconsistencies in Defendant's engagement documentation, withdrawal, and refund policies. Plaintiff reported that improper withdrawals subjected students to Return to Title IV (R2T4) actions and forced re-enrollments, thereby generating new Title IV disbursements supported by false PPA certifications.
3. *Internal Fraud Objection — December 2024.* Plaintiff submitted a written objection to Supervisor Olsen identifying four specific indicia of fraud in a Special Credit Request ("Alberto" reference, uncorroborated CrowdStrike outage, no timestamped documentation, no appointment record). Olsen's institutional directive to process the request is the source of a fraudulent federal fund adjustment, as processing the SCR triggers a mandatory R2T4 recalculation under 34 C.F.R. § 668.22.
4. *Minnesota Office of Higher Education Complaint — February 23–26, 2025.* Plaintiff filed a comprehensive complaint reporting conduct he reasonably believed constituted false certifications material to Defendant's continued receipt of Title IV funds:

   *First:* Plaintiff reported that Defendant's deliberate retrieval of the Special Credit Request refund information page from its student platform—restructuring access to federally-mandated R2T4 refund rights as a gatekept escalation mechanism precisely when disaster-affected students were re-engaging—produced false certifications of PPA compliance.

   *Second:* Plaintiff reported that maintaining a written policy against correcting known grade errors affecting federal aid eligibility, while simultaneously certifying PPA compliance regarding accurate student records under 34 C.F.R. §§ 668.14 and 668.34, produced false certifications.

*Third:* Plaintiff reported that replacing an accessible digital refund resource with an inaccessible PDF violated ADA Title III and Section 508 requirements, creating unlawful barriers for disabled students while Defendant continued certifying Section 504 compliance for Title IV receipt.

*Fourth:* Plaintiff reported Defendant's Student Disability Services informed a legally blind student she did not need accommodations despite an explicit request, while Defendant continued certifying Section 504 compliance.

**Plaintiff's Belief Was Objectively Reasonable.** Plaintiff's belief was anchored in documented institutional history. ED-OIG Final Audit Report ED-OIG/A05G0017 had previously cited Defendant for improperly retaining Title IV funds through the same engagement mechanisms Plaintiff observed in 2024. Additionally, Defendant has judicially admitted its inclusion as a named institution in the *Sweet v. McMahon* settlement framework regarding automatic Borrower Defense to Repayment (BDAR) discharges, which are predicated on institutional fraud.

**Employer Knowledge.** Defendant had knowledge of Plaintiff's protected activity through four distinct layers:

- **Layer One (Circumstantial Awareness via Email Lockout):** Within 72 hours of Plaintiff's February 7, 2025, FSA complaint filing, Defendant disabled email forwarding on Plaintiff's institutional Outlook account for 33 hours without notice or operational explanation. This action is most plausibly explained as an immediate institutional response to Plaintiff's external filing.
- **Layer Two (Constructive Notice):** Plaintiff filed his OHE complaint on February 23, 2025. The OHE is Capella's designated SARA portal agency. On February 24, Institutional Monitoring Specialist Kate McCartan confirmed receipt and escalation. That same day, Defendant's HR decisionmakers internally concluded Plaintiff was "seeking legal counsel" and immediately accelerated his performance review.
- **Layer Three (Direct Recognition):** On February 26, 2025, Director RT Taylor escalated Plaintiff's communications regarding BDAR discharges to HR, characterizing them in writing as a "legal statement."
- **Layer Four (Express Notice):** On February 26, 2025, at 5:44 PM, Plaintiff sent formal written notice to Supervisors Olsen, Taylor, and SEI HR explicitly identifying "serious legal violations that leadership is aware of" and formalizing that he "engaged in protected whistleblower activity on February 7, 2025."

**Causation.** Defendant terminated Plaintiff exactly 14 days after his formal whistleblower notice, executing the termination through a pretextual HR mechanism ("Details not available" / "Not Qualified") that failed to articulate a legitimate non-retaliatory motive on its official state filing.

**COUNT IV — SECTION 504 OF THE REHABILITATION ACT Disability Discrimination (29 U.S.C. § 794)** Plaintiff incorporates all prior paragraphs by reference.

**Defendant Is Subject to Section 504.** As a recipient of approximately $319 million in Title IV funds, Defendant is a program or activity subject to Section 504.

**Sole Causation During the Pre-Whistleblower Period.** The discriminatory framework used to discipline and ultimately terminate Plaintiff was constructed entirely during the period from April 12, 2024 to October 18, 2024. During this time, Plaintiff had engaged in zero FCA-protected activity. During that same period, Defendant imposed unwritten evaluation standards following Plaintiff's disclosure, cited him for "speaking rudely" within 32 days, bypassed progressive discipline to issue a final written warning, pre-determined the outcome of the accommodation process within 24 hours, and placed Plaintiff in undocumented Behavioral Performance Coaching focused on his autism-related traits.

The only variable preceding these adverse actions was Plaintiff's April 12, 2024 disability disclosure, satisfying the sole causation standard of Section 504 for the pre-whistleblower record.

**The Pre-Whistleblower Framework Drove All Subsequent Actions.** Because the performance record Defendant relied upon to terminate Plaintiff was entirely manufactured through this pre-whistleblower disability discrimination framework, Plaintiff's disability was the sole but-for cause of both the disciplinary framework and the resulting termination under 29 U.S.C. § 794.

**COUNT V — AMERICANS WITH DISABILITIES ACT Interference, Coercion, and Intimidation (42 U.S.C. § 12203(b))** Plaintiff incorporates all prior paragraphs by reference.

Section 12203(b) makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of having aided or encouraged any other individual in the exercise of, any right granted or protected by the ADA.

Defendant unlawfully interfered with Plaintiff on account of his having aided other individuals in the exercise of their ADA rights by terminating Plaintiff fourteen days after he: (1) advised a legally blind student of her right to file an OCR complaint on February 25, 2025; and (2) filed the OHE web accessibility complaint documenting barriers for disabled students on February 23-26, 2025.

Defendant further executed specific acts of interference against Plaintiff's own ADA rights:

- **Right to request accommodation:** McHugh's written pre-determination on June 5, 2024, issued within 24 hours and before any interactive dialogue, coercing Plaintiff to abandon the accommodation process.
- **Right to engage in the interactive process:** Imposing a structurally impossible 15-day deadline in a provider shortage area with an automatic closure threat.
- **Right to participate in EEOC proceedings free from obstruction:** Altering Plaintiff's official personnel file to strip his disability disclosure, accommodation request, and signature, executed exactly as Defendant's HR personnel internally documented that Plaintiff had "requested Employee Records," thereby interfering with the preservation of records material to an ADA proceeding.

- **Right to exercise ADA rights free from coercion and intimidation**: As a fully remote employee, Plaintiff's employer-provided email account was his sole mechanism for documenting ongoing disability discrimination, engaging in the interactive process, and accessing the administrative record of his accommodation requests. By deliberately disabling Plaintiff's email communication channel for 33 hours without notice during an active dispute—cutting off a remote, neurodivergent employee from his only lifeline to workplace authorities and his own employment records—Defendant engaged in an act of coercion and intimidation that functionally paralyzed Plaintiff's ability to exercise and document his ADA rights.
- **Right to be free from disability-based discrimination:** Director Taylor's real-time deletion of Microsoft Teams evidence during the termination meeting, and Defendant's post-termination demand for PTO repayment contrary to written policy.

**PRAYER FOR RELIEF** WHEREFORE, Plaintiff Robert Trent respectfully requests that this Court enter judgment against Defendant Capella University, LLC and grant the following relief:

A. Declaratory Relief. A declaration that Defendant's actions violated the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the False Claims Act, 31 U.S.C. § 3730(h).

B. Injunctive Relief. An order requiring Defendant to: correct Plaintiff's official personnel records to reflect the authentic June 4, 2024 Corrective Action Form; implement ADA-compliant accommodation policies and procedures; implement disability awareness and accommodation training; and cease retaliating against employees who engage in protected activity under the ADA, the Rehabilitation Act, or the False Claims Act.

C. Reinstatement or Front Pay. An order reinstating Plaintiff to his former position or a comparable one; or, in the alternative, an award of front pay sufficient to compensate Plaintiff for the loss of future earning capacity.

D. Back Pay and Lost Benefits. An award of back pay for all wages, salary, and benefits lost from the date of termination through the date of judgment, including lost health insurance, retirement contributions, and PTO improperly demanded for repayment.

E. Compensatory Damages. An award of compensatory damages for emotional distress, anxiety, humiliation, physical manifestations of stress, loss of professional reputation, costs of seeking new employment, and costs of medical and psychological care.

F. Punitive Damages. An award of punitive damages under the ADA for Defendant's reckless indifference to Plaintiff's federally protected rights, as demonstrated by Taylor's real-time evidence destruction, the deliberate backdating and signature-stripping of personnel records, the structurally impossible accommodation process, the simultaneous denial of accommodations to Plaintiff and a legally blind student, and the coordinated termination of protected-class employees.

G. False Claims Act Relief. An award under 31 U.S.C. § 3730(h) of double back pay with interest, special damages, and reinstatement or front pay in the alternative.

H. Attorneys' Fees and Costs. An award of reasonable attorneys' fees, expert witness fees, and litigation costs pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a, and 31 U.S.C. § 3730(h).

I. Pre- and Post-Judgment Interest. An award of pre- and post-judgment interest at the maximum rate permitted by law.

J. Additional Relief. Such other and further relief as the Court deems just and proper.

**JURY DEMAND** Plaintiff demands a trial by jury on all issues so triable pursuant to the Seventh Amendment and Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

/s/ Robert Trent

**ROBERT TRENT**

Pro Se Plaintiff

7510 88th St.

Lubbock, TX 79424

(806) 507-1592

Robert.trent0139@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2026, a true and correct copy of the foregoing Notice and all attachments was served on all counsel of record via the Court's CM/ECF system:

Terran C. Chambers – terran.chambers@faegredrinker.com

Susan A. Yelk – susan.yelk@faegredrinker.com

Sara E. Inman – sara.inman@faegredrinker.com

Hannah Hughes – hannah.hughes@faegredrinker.com

/s/ Robert Trent

**ROBERT TRENT**